THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD JERRY LAND, Defendant-Appellant.

Fourth District   No. 4—87—0300

Opinion filed May 12, 1988.

344

Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

On April 28, 1986, a delinquency petition was filed against Ronald Land alleging attempt (murder). Simultaneously, the State filed a motion seeking prosecution under the criminal laws. Following hearing, the court granted the motion to transfer and on May 5, 1986, the defendant was charged by information with seven counts of murder and two counts of aggravated criminal sexual assault. The cause proceeded to trial and the jury returned guilty verdicts on charges of felony murder and involuntary manslaughter. The defendant was subsequently sentenced to the Department of Corrections, Juvenile Division, for a term of 30 years. From this conviction and sentence, the defendant appeals.

The defendant raises numerous issues for our consideration on appeal, including: (1) whether the juvenile court had proper jurisdiction to enter the transfer order; (2) whether the determination to transfer constituted an abuse of discretion; (3) whether the defendant's statements to Officer Woodard were properly admitted into evidence at trial; (4) whether the convictions for felony murder and involuntary manslaughter are legally inconsistent; (5) whether the State properly proved the elements of cruelty to children which presumably served as the predicate offense for felony murder; (6) whether the trial court abused its discretion in sentencing; and (7) whether the court erred in entering a judgment on both convictions.

The delinquency petition filed on April 28, 1986, alleged that the defendant, on April 26, 1986, committed the offense of attempt (murder) by submerging the 16-month-old victim underwater with knowledge that such conduct would cause death or great bodily harm. On April 28, 1986, the defendant appeared in juvenile court with his mother and was ordered detained.

On May 1, 1986, the petition was amended alleging four counts of murder and one count of aggravated criminal sexual assault. On May 5, 1986, hearing was held on the State's motion to transfer. The motion was granted. There were no objections to the jurisdiction of the court.

On May 5, 1986, the defendant was charged by information with seven counts of murder and two counts of aggravated criminal sexual assault. On July 25, 1986, summons was issued by the clerk, directed to the natural parent and the minor in detention. Service was obtained on July 28, 1986. It is undisputed that no service of summons was had upon the minor or his mother prior to this point in time.

On July 28, 1986, the State filed an amended information charging the defendant with seven counts of murder and one count of ag-

gravated criminal sexual abuse.

On July 28, 1986, a motion to dismiss the criminal information was filed. On the same date, a motion was filed in the juvenile case seeking to vacate the transfer order due to a lack of personal jurisdiction. The matter proceeded to hearing in the juvenile division and on August 8, 1986, the motion to vacate the transfer order was denied.

On September 15, 1986, arguments were heard on the motion to dismiss the criminal information. The court denied the motion, specifically finding that the minor voluntarily submitted to the jurisdiction of the courts under the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*) as well as the adult courts, thereby waiving service of process. The court noted the minor appeared on numerous occasions and at all times was represented by counsel and was accompanied by his mother.

A jury trial commenced on October 22, 1986. The State presented Dawn Walls, mother of the 16-month-old victim. She testified that on the weekend of April 25, 1986, she went to stay with Patti Foote at her apartment in Danville. Patti lived with her two children, Brent Michael, age 11 months, and Loyal Wayne, who was four years old. Patti Foote's mother, Janet Land, and Patti's brother, the defendant Ronald Land, lived in the apartment upstairs.

On the evening of April 26, at approximately 9 p.m., Dawn Walls and Patti Foote left the victim, Brent, and Loyal in the care of Janet Land. It was understood that when the defendant returned, he would baby-sit for the three children as he often did. Between 10 and 10:30 p.m. the defendant returned and Janet Land went to the upstairs apartment, leaving the defendant to care for the three children. Janet Land testified that when she left Loyal was awake and the victim and Brent were sleeping. At approximately 11 p.m., the defendant called his mother at the upstairs apartment informing her that the victim was having trouble breathing. Janet Land ran to the downstairs apartment, called 911 for help, and instructed the defendant to find Dawn Walls and Patti Foote.

At 11:04 p.m., police officer Richard Anderson arrived at the scene. According to Anderson, the victim was cool to the touch and was not breathing. A few seconds later, police officer Robert Huff and fire fighters David Hilliger and Glen Laird arrived. Hilliger observed that the child had no pulse, was not breathing, and was covered with bruises. Hilliger and Laird both observed that the child was cold to the touch and blue in color. They stated that the child's hair and diaper were dry. Hilliger immediately administered cardiopulmonary resuscitation to the child. Shortly thereafter, an emergency team of

three paramedics arrived in an ambulance. The victim was immediately transported to Lakeview Hospital.

The State presented a great deal of evidence regarding the victim's medical condition and treatment, the details of which are not pertinent to our disposition here. Briefly, however, the victim was admitted to the emergency room at Lakeview Hospital at approximately 11 p.m. She was not breathing and had no heartbeat. Within a few minutes of admission, a heartbeat and breathing were established. The victim was then attached to a life support system and was later transferred to the intensive care unit of the hospital. All of the medical staff that worked with the victim in the emergency room testified that her body was covered with bruises.

After two days of extensive monitoring and testing, it was determined that the victim was brain dead. Brain death is defined as the irreversible cessation of all brain functions. A decision was then made to remove the victim from the life support equipment.

Dr. William Steinmetz, the pathologist who performed the autopsy on the victim, testified to extensive bruising all over the child's body. His internal examination revealed two fractured ribs, hemorrhages in the soft tissues of the neck, congestion of the spleen, pneumonia in both lungs, and other abnormalities in the stomach and urinary tract. Although there was no evidence of external traumatic injury to the head, Dr. Steinmetz found large areas of hemorrhage underneath the dura, the membrane surrounding the brain. There was also an accumulation of fluid in the tissue of the brain. It was Dr. Steinmetz' professional opinion that death resulted from anoxic encephalopathy or death of the brain due to lack of oxygen. Steinmetz further opined that the condition was the result of traumatic injuries to the head.

The defendant was brought into custody on the evening of the incident, April 27, 1986. At approximately 3 a.m., Romadelle Austin, an investigator with the juvenile division of the Danville police department, took a taped statement from the defendant. The tape was played for the jury at trial.

After being informed of his rights, the defendant told Austin he was baby-sitting for the victim and his two nephews, Loyal Wayne and Brent Michael, on the evening of April 26, 1986. The victim, who was 16 months old, and Brent Michael were sleeping while Loyal Wayne was watching television. The victim then woke up and started to cry. The defendant tried to quiet the victim with toys and then decided to give her a bath. The defendant left the victim alone in the bathtub while he went to check on the other children and find the victim a fresh diaper. Upon returning to the bathroom, the defendant

found the victim lying face first in the water. He took the victim out of the tub, placed her on the floor, and attempted mouth-to-mouth resuscitation. Approximately 15 minutes later, the defendant called his mother for help. The defendant further admitted that on past occasions he had placed his penis in the victim's vagina, but denied having done so on the night of April 26, 1986. This was the entire content of the defendant's first statement.

On April 27, 1986, at approximately 9 p.m., Officer Gene Woodard interviewed the defendant. The defendant's statements were again tape-recorded. The defendant told Officer Woodard that he was baby-sitting for the victim and his two nephews at his sister's apartment when the victim awoke and started to cry. The more the victim cried the more upset the defendant became. The defendant tried to get the victim to stop crying by hitting her with a towel, tapping her on her back and stomach with a snorkel, and placing his hand over her mouth. The defendant also admitted to hitting the victim a few times on her butt with his hand. The defendant next put the victim in the bathtub. The victim, however, continued to cry. The defendant poured water over the victim's head and dunked her head underwater for a few seconds. He then left the bathroom in order to check on the other children. When he returned to the bathroom, the victim's head was still underwater. He then took the victim out of the bathtub and observed that she was not breathing. He gave the victim mouth-to-mouth resuscitation and attempted to pump her stomach. The defendant claimed the victim spit up some water and started to breath again. Approximately 15 minutes later, the defendant called his mother for help. The defendant again admitted that on prior occasions he had placed his penis in the victim's vagina, but denied having done so on the night of the incident. This was the sum of the defendant's second statement.

On April 28, 1986, at approximately 2 p.m., Officer Gene Woodard again met with the defendant and took a third taped statement. In this statement, the defendant stated that he did not want to baby-sit because he had plans to go out with his friends. When the victim started to cry, the defendant became upset. He tried to stop the victim from crying by shaking a towel at her, hitting her with a snorkel on the back and stomach and putting his hand over the victim's mouth. He stated that he spanked the victim's butt four to six times with his hand and shook the victim's face. He additionally said that he bounced the victim off a bed which resulted in her hitting her head up against the wall. The victim, however, continued to cry and the defendant then decided to put her in the bathtub. He poured water

over the victim's head and dunked her head underwater for a couple of seconds. The defendant then left the bathroom in order to attend to the other children. At the time he left, the victim's head was still underwater and the defendant assumed she was blowing bubbles. When the defendant returned to the bathroom, approximately five minutes later, he observed the victim lying limp in the tub. The defendant took the victim out of the tub, gave her mouth-to-mouth resuscitation, and attempted to pump her stomach. Water came out of the victim's mouth and nose, and the victim started to breath again. The defendant then put a fresh diaper on the victim and placed her on a mattress. The victim, however, started to turn colors and the defendant called his mother for help. The defendant admitted that he tried to have sexual intercourse with the victim on prior occasions, but denied any such activity on the night of the incident. The defendant concluded this statement by saying that he did not mean to harm the victim and that he was only trying to stop her from crying.

The State also presented evidence regarding the physical condition of the victim prior to the time she was left in the care of the defendant. The victim's mother as well as others testified that the victim had one small bruise on her forehead, a mark around her neck, and a scratch on the side of her nose. According to these individuals, the victim had no other bruises on her body.

The defense rested without putting on any evidence. Following deliberations, the jury returned verdicts of not guilty on the charges of murder and aggravated criminal sexual abuse and verdicts of guilty on the charges of felony murder and involuntary manslaughter. The cause was set over for sentencing and the defendant was subsequently sentenced to 30 years in the Department of Corrections. From this conviction and sentence, the defendant appeals.

JURISDICTION AND TRANSFER

The defendant initially maintains the circuit court was without jurisdiction to enter the transfer order because he was never formally served. It is uncontradicted that the defendant and his mother first received formal service of process on July 28, 1986, after the defendant was transferred to the criminal court for prosecution as an adult.

■■ ■ The Juvenile Court Act requires that subsequent to the filing of a juvenile petition, the court must issue summons to the minor and each person named as a respondent in the petition. (Ill. Rev. Stat. 1985, ch. 37, par. 704—3(1).) Although due process mandates appropriate notice be afforded juveniles, as with other constitutional rights, an individual may waive application. (*In re Application of Gault*

(1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428.) Consequently, where a juvenile, or any named respondent, appears before the court and participates in proceedings, he waives the formality of service of process and voluntarily submits to the jurisdiction of the court. (See *In re R.R.S.* (1987), 160 Ill. App. 3d 548, 514 N.E.2d 192, *rev'd* (1988), 118 Ill. 2d 544, 521 N.E.2d 864 (supervisory order).) In the case before us, the defendant and his mother appeared before the court on numerous occasions. The defendant was represented by counsel. There were no objections to the jurisdiction of the court until July 25, 1986. Meanwhile, the defendant, with his mother and counsel, appeared before the court and participated in hearings. As a result, per the supreme court's supervisory order in *R.R.S.*, the defendant cannot now contest the jurisdiction of the court.

On May 2, 1986, proceedings on the State's motion to transfer began. Officer Gene Woodard testified regarding his interactions with the defendant. Woodard informed the court that he personally knew the defendant and had contact with the defendant over the past five years. Woodard explained that the defendant had behavioral and emotional problems which had necessitated police interaction on several occasions. The defendant's taped statements to Woodard were then admitted into evidence.

Larry Mills, assistant State's Attorney, testified to the injuries sustained by the victim and the cause of death. Mills attended the autopsy of the victim and conferred with the attending pathologist.

Police officer Kelvin Showers testified to his previous contacts with the defendant. In February of 1986, the defendant was involved in a violent altercation with his mother. During the incident, the defendant made threats to kill his mother. The police were called to intervene in this incident. Showers further testified that the defendant had been the victim of physical abuse and police records evidenced three successive reports of abuse in 1983.

The defendant presented Marilyn Kolton, executive director and clinical supervisor of the center for children's services. Kolton was ordered by the court to conduct a psychological evaluation of the defendant. Kolton diagnosed the defendant as an emotionally disturbed adolescent who functions at a much lower emotional level than the typical 13-year-old. Kolton recommended that the defendant be placed in a therapeutic residential school that could meet his needs for continuing psychological counseling. Kolton maintained that the defendant did not understand the magnitude of his actions, did not comprehend how vulnerable a 16-month-old child was, and did not fully realize the consequences of what had happened.

There was additional evidence of a history of ongoing physical and verbal confrontations between the defendant and his mother. In 1982, the defendant was placed in the Parke House, a residential treatment facility for emotionally and behaviorally disturbed children. The defendant remained at the Parke House for approximately nine months. Although the defendant made progress while at Parke House, he deteriorated rapidly upon release. William Utesch, a residential therapist at Parke House, recommended that the defendant be placed in a facility with a high degree of structure for an extensive period of time. Utesch stressed the defendant's need for continuing therapy.

At the close of the evidence, the court allowed the motion to transfer. The court made specific note of: (1) the evidence presented against the defendant; (2) the violent and aggressive nature of the injuries inflicted; (3) the defendant's history of contacts with the police and social agencies in the community; (4) the availability of juvenile treatment facilities and the prospect of rehabilitation; and (5) the best interests of the defendant as well as the public. It was the conclusion of the court that these factors weighed in favor of prosecution as an adult.

■ The determination of whether to retain jurisdiction over a juvenile or to transfer for prosecution as an adult is one within the sound discretion of the circuit court. (*People v. Clark* (1987), 119 Ill. 2d 1, 518 N.E.2d 138; *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) The court's discretion, however, must be exercised within the limits of due process and must be in comport with the applicable statutory guidelines. (*Clark*, 119 Ill. 2d 1, 518 N.E.2d 138.) Upon review, it is our duty to determine whether, in evaluating the evidence in light of the statutory criteria, the court judge abused his discretion. *Clark*, 119 Ill. 2d 1, 518 N.E.2d 138; *Taylor*, 76 Ill. 2d 289, 391 N.E.2d 366.

■ Pursuant to the Juvenile Court Act, a determination to transfer requires consideration of the following matters:

"(1) [w]hether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a

period extending beyond his minority." (Ill. Rev. Stat. 1985, ch. 37, par. 702—7(3)(a).)

In order to withstand reversal upon appeal, there must be sufficient evidence in the record with respect to each statutory factor; a mere recitation by the court that all factors have been considered is not enough. *Clark*, 119 Ill. 2d at 18, 518 N.E.2d at 145.

The record before us reveals a careful consideration of each statutory factor. The court initially noted that the evidence presented during the hearing was sufficient for a grand jury to return an indictment. The court made specific note of the age of the victim and the fact that the defendant could not have been provoked. Next, the court considered the seriousness of the offense, particularly whether it was committed in an aggressive and premeditated manner. The court concluded that the nature of the injuries inflicted and the fact that the incident clearly resulted from a series of increasingly violent acts by the defendant indicated a premeditated and aggressive act. The court stressed that premeditation need not be lengthy in duration and the facts did not support an indication that the death of the victim was accidental.

The court went on to consider the history and age of the minor, highlighting the minor's continued interactions with the police department and social agencies in the community. The court specifically noted the defendant's history of violence at home and toward his mother. The court recognized defendant's mother's inability to control his behavior. Defendant's problems at school were also recognized. The court then noted, "It is the clear consensus of the experts that have testified that this young man needs a long term, highly structured residential setting, and I agree with that."

Finally, the court considered the availability of treatment facilities and the potential for rehabilitation. It was the court's ultimate determination that there were not adequate facilities which could provide the long-term treatment that was required for the defendant. Additionally, the court concluded that the interests of the public require that the defendant be under supervision beyond his minority. The court deemed this necessary to prevent any repetition of the violence as demonstrated by the defendant in this particular incident. In viewing the entire record of the transfer proceeding, it is clear that the court carefully weighed each statutory factor. As such, the determination to transfer was proper.

## TESTIMONY OF OFFICER WOODARD

During trial, Officer Woodard testified as to his past relation-

ship with the defendant and the confessions the defendant made to him immediately after the incident. Evidence indicated Woodard interviewed the defendant on two separate occasions. On both instances, the defendant was informed of his constitutional rights and willingly agreed to speak with Woodard. Both conversations were recorded. The defendant now maintains that because Officer Woodard was his trusted friend and confidant, the statements given were the result of psychological coercion. As a result, the defendant claims admission of these statements constituted reversible error.

Prior to trial, the defendant presented a motion *in limine* to suppress the statements made to the police. In the motion, the defendant specifically alleged: (1) he had not knowingly and intelligently waived his right to remain silent and his right to an attorney; (2) his statements were improperly induced by hope of leniency as he understood he would be released following interrogation; (3) he was confined in the county jail contrary to the Juvenile Court Act; and (4) his statements were not free and voluntary because the officers indicated to him that his mother had given permission for interrogation. Following presentation of evidence, the court denied the defendant's motion to suppress. In his post-trial motion, the defendant claimed error on behalf of the trial court in denying this motion.

During trial and in his post-trial motion, the defendant made no allegations regarding the alleged relationship between the defendant and Officer Woodard. There was never any indication that Officer Woodard psychologically manipulated the defendant. The defendant cannot now object to the evidence on these grounds. A specific objection at trial regarding the admissibility of evidence waives all other grounds for objection upon review. (*People v. Barrios* (1986), 114 Ill. 2d 265, 500 N.E.2d 415.) The admissibility of this evidence was extensively reviewed by the court prior to trial. Consequently, any allegations of psychological coercion on behalf of the police were waived. We see no need to address this issue on the merits now.

FELONY MURDER CONVICTION

■ At the close of evidence, the jury was instructed on the following offenses: murder, felony murder, involuntary manslaughter, and aggravated criminal sexual abuse. With respect to the offense of felony murder, the jury was informed:

> "To sustain the charge of murder (commission), the State must prove the following propositions: First, that the defendant performed the acts which caused the death of [the victim]; and second, that when the defendant did so, he was committing or

attempting to commit the offense of aggravated battery, aggravated criminal sexual abuse, or cruelty to children."

The offense of cruelty to children was defined as the knowing, intentional or reckless injury to the health or limb of a child. The jury was instructed as to the definitions of aggravated battery, aggravated criminal sexual abuse, and cruelty to children. A verdict form was given to the jury for criminal sexual abuse and they found the defendant not guilty. Separate verdict forms for aggravated battery and cruelty to children were not given the jury. With respect to the counts of murder, the defendant was found not guilty of murder and guilty of felony murder. The verdict form for the felony murder offense did not specify which felony (aggravated battery, aggravated criminal sexual abuse, or cruelty to children) served as the predicate offense. The jury also found defendant guilty of the included offense of involuntary manslaughter.

The defendant now asserts that the verdicts are legally consistent only if the conviction for felony murder was predicated upon the offense of cruelty to children committed with a reckless state of mind. The defendant further claims that reckless cruelty to children cannot serve as a predicate offense for felony murder.

The State initially contends that the defendant has waived this argument by failing to object to the verdict form at the trial level. Although the defendant did not make a specific objection to the verdict form, the defendant objected during the jury instruction conference to the inclusion of a reckless state of mind in the cruelty to children instruction. Furthermore, the defendant raised this specific issue in his post-trial motion. This is sufficient to preserve the issue for our consideration.

Initially, as asserted by the defendant, we must presume that the conviction for felony murder was predicated upon the commission of reckless cruelty to children. This presumption is necessary for the two verdicts rendered against the defendant to be legally consistent. In order for the defendant's convictions of involuntary manslaughter and felony murder to be legally consistent, the defendant must have acted with one state of mind. A conviction for involuntary manslaughter indicates that the defendant acted recklessly. Consequently, the conviction for felony murder must also be based upon a reckless act. A defendant cannot act recklessly and knowingly or recklessly and intentionally at the same time. (See *People v. Spears* (1986), 112 Ill. 2d 396, 493 N.E.2d 1030; *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335.) Consequently, the predicate offenses of aggravated criminal sexual abuse and aggravated battery which require mental states

other than recklessness would result in inconsistent verdicts. Moreover, the jury specifically found the defendant not guilty of aggravated criminal sexual abuse and not guilty of murder, which eliminates the mental states of knowing and intentional. By a process of elimination, it thus becomes apparent that the predicate offense for defendant's felony murder conviction was reckless cruelty to children. Thus, we conclude that the jury verdicts of involuntary manslaughter and felony murder based upon cruelty to children are legally consistent.

■■ It then becomes necessary to determine whether a conviction for felony murder can be predicated upon an offense which is committed with a reckless state of mind. Felony murder is statutorily defined as follows:

> "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> * * *
>
> (3) He is attempting or committing a forcible felony other than voluntary manslaughter." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3).)

A conviction for felony murder does not require a showing of an intent to kill. (*People v. Ellis* (1981), 93 Ill. App. 3d 981, 418 N.E.2d 88.) It does, however, require proof of all elements of the underlying forcible felony.

A forcible felony is defined as:

> "[T]reason, murder, voluntary manslaughter, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, arson, kidnaping, aggravated battery and any other felony which involves the use or threat of physical force or violence against any individual." (Ill. Rev. Stat. 1985, ch. 38, par. 2—8.)

It is of importance to note that all of the felonies specifically enumerated in the definition of a forcible felony, with the exception of voluntary manslaughter, are felonies with mental states of knowing or intentional. Voluntary manslaughter is the only felony enumerated in the definition of forcible felony which is based upon a reckless state of mind. Voluntary manslaughter, however, is specifically excepted from the felony murder statute. This seems to indicate an obvious intention that a predicate forcible felony underlying a felony murder conviction be intentional.

■■ It is a well-accepted principle of statutory construction that where a list of specific terms is followed by a general term, that general term must be construed to include only the same type of item as

indicated by the specifics. (See *People v. Singleton* (1984), 103 Ill. 2d 339, 469 N.E.2d 200; *People v. McBrien* (1986), 144 Ill. App. 3d 489, 494 N.E.2d 732.) By incorporating the statutory definition of forcible felony into the felony murder statute, it is apparent that the "any other felony" language is limited to intentional felonies. Consequently, it is our conclusion that the application of the felony murder rule should be limited to those predicate felonies with an intentional or knowing state of mind requirement.

An examination of the legislative policy underlying the offense of felony murder provides further support to the concept that the predicate felony must be an intentional felony. The concept of felony murder originally developed to deter the commission of the enumerated forcible felonies by holding the perpetrator responsible for murder if death resulted as a consequence of the felony. (*People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903.) In *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, the Illinois Supreme Court discussed the conceptual difficulty of deterring an unpremeditated crime. The issue before the court was whether a conviction for armed violence could be predicated upon the offense of voluntary manslaughter. (*Alejos*, 97 Ill. 2d 502, 455 N.E.2d 48.) The court examined the policy underlying the increased penalty for an armed violence conviction, that being the deterrence of the conduct of carrying weapons during the commission of felonies. (*Alejos*, 97 Ill. 2d at 509, 455 N.E.2d at 51.) The court concluded that voluntary manslaughter could not serve as the basis for an armed violence conviction due to the lack of intent to commit a crime in advance of the incident. (*Alejos*, 97 Ill. 2d at 509, 455 N.E.2d at 51.) This lack of premeditation or reflection cannot be deterred. Consequently, the policy underlying an armed violence conviction cannot be fulfilled absent the contemplation of a felonious act. *Alejos*, 97 Ill. 2d at 509, 455 N.E.2d at 51.

In *People v. Fernetti* (1984), 104 Ill. 2d 19, 470 N.E.2d 501, this concept was extended to include the offense of involuntary manslaughter. The court concluded that involuntary manslaughter could not serve as a predicate felony under the armed violence statute based upon the inability to deter unintentional acts.

The same argument applies with equal force to the case before us now. The purpose underlying the increased penalty for a murder that results during the commission of a felony is deterrence. Where an individual acts recklessly, deterrence is not possible. Consequently, a predicate conviction for a reckless act would not serve the deterrent purposes underlying the felony murder statute.

It is our conclusion, based upon the statutory language and policy

underlying the felony murder statute, that the predicate felony upon which the murder conviction is based must involve an intentional or knowing state of mind. As a result, the defendant's conviction for felony murder based upon a reckless act cannot stand.

Based upon our reversal of defendant's felony murder conviction, it becomes necessary to remand defendant's cause for resentencing. As a result, we see no need to address defendant's allegations of improper sentencing.

Based on the foregoing, the defendant's conviction for involuntary manslaughter is affirmed and the defendant's conviction for felony murder is reversed. The defendant's cause is remanded for resentencing.

Affirmed in part; reversed in part and remanded for resentencing.

GREEN, P.J., and KNECHT, J., concur.