THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL T. SANDY, Defendant-Appellant.

Fourth District No. 4—88—0843

Opinion filed September 28, 1989.

834

Michael Q. Jones, of Urbana, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and J.A.C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

A jury convicted defendant of two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3)), aggravated battery based

upon great bodily harm (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a)), aggravated battery of a child (Ill. Rev. Stat. 1987, ch. 38, par. 12—4.3(a)), and cruelty to children (Ill. Rev. Stat. 1987, ch. 23, par. 2368). The jury found defendant not guilty of two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)) and not guilty of one count of first degree murder based upon aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3)). The court sentenced defendant to 35 years' imprisonment.

Defendant appeals, arguing: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred in refusing his instruction defining "knowingly"; (3) the trial court erred in refusing to instruct the jury that involuntary manslaughter is an included offense in felony murder; (4) verdicts of guilty of felony murder based upon aggravated battery and not guilty of murder are legally and logically inconsistent; and (5) testimony concerning "Tin Ear Syndrome" was improperly admitted.

We affirm.

On January 13, 1988, an information was filed charging Michael Sandy, defendant, with several offenses in connection with the death of H.N. At trial, Robert Huff, a Danville police officer, testified that on January 11, 1988, at 5:45 p.m., he responded to an emergency call. When he arrived at the scene, Huff saw defendant and a child, who was not breathing. While en route to the hospital, defendant said he had not meant to do it. He went out to get a Coke, and when he came back to the bedroom, H.N. was lying on the floor. Defendant told Huff the child bruised easily. Huff observed a large bruise underneath H.N.'s chin and a bruise on her arm. At the hospital, defendant told Huff that Lisa Norman, H.N.'s mother, went to pick up dinner. H.N. made faces at defendant, so he went into the bedroom to reprimand her. He shook her, then went to get a soft drink. When he reentered the bedroom, she was lying on the floor.

Gene Woodward, an investigator with the Danville police department, arrived at St. Elizabeth's Hospital at 6:10 p.m. He talked to Huff; then looked at H.N. at 6:15 to 6:20 p.m. Woodward noticed bruises on H.N.'s right eye, both cheeks, left ear, her chin, back of the neck, chest between the nipples, above her navel, both arms, the cheeks of her buttocks, and the area between both of her buttocks.

Michael J. Meinzen, director of the trauma center at St. Elizabeth's Hospital, testified that at 5:50 p.m. he began treating H.N. She had no movement, no pulse, and was not breathing. Her skin appeared pale and bluish in tint. After four minutes, the emergency team had reestablished a heartbeat. Meinzen wanted to account for

bruises not caused by his team's effort to revive H.N. He noted a bruised jaw, belly, behind the left ear, and buttocks. Notations were made of these bruises within two minutes of resuscitating H.N. Because of the bruises, he thought there might be a head injury. The bruised left ear led him to believe she had received a blow to the head. H.N.'s physical reactions indicated increasing pressure on the brain and damage to the brain on the opposite side from the bruising. Meinzen believed she received a blow to the left side of the head.

Meinzen talked to defendant, who told him H.N. had a tantrum whenever her mother left. When her mother left to get food that evening, H.N. was screaming. H.N. bruised easily after her last surgery so he did not spank her. He took her to the bedroom, shook her to get her to stop screaming, and made her stand in a corner. When he returned to the bedroom, H.N. was twitching on the floor.

Meinzen stated shaking could have caused the trauma. The markings on the left ear were medium-sized bruises. However, Meinzen would not disagree with those who classified them as large bruises. It is possible that all of the trauma could have resulted from a single blow to the left ear. It could also have come from shaking. It was impossible to answer with certainty that a shaken child would have equal-sided brain disfunction. H.N. developed disseminated intravascular coagulation (DIC) subsequent to the trauma. This means her blood would not clot. A small injury, therefore, could result in larger bruises. Given that H.N. was a frail child, any attention-getting sort of shake could lead to injuries.

Lawrence Rossi, director of pediatric intensive care at St. Francis Medical Center in Peoria, flew to Danville on January 11, 1988, and eventually transported H.N. to Peoria. H.N. was critically ill and exhibited symptoms of increased pressure on her brain. Rossi was not concerned that H.N.'s prior heart condition caused the problem. Tests conducted at St. Francis indicated abnormally high intracranial pressure and bleeding problems. Rossi determined H.N. was clinically brain dead.

Rossi believed a blow to the head had caused H.N.'s symptoms. He stated her physical reactions, the bruised left ear, and the initial nonglobal edema indicated a direct blow. It was more probable than not that H.N. received a direct traumatic blow to her ear, rather than being shaken. Rossi could not eliminate the possibility of a combination of a blow and shaking, but stated the major traumatic event seemed to be a direct blow. Rossi further stated that swelling of the brain occurs as a result of "Shaken Child Syndrome." Rossi admitted

shaking could not be positively ruled out as a potential cause of H.N.'s death.

William Albers, H.N.'s cardiologist, stated H.N. was born with a serious heart defect. She had surgery at four weeks old and open heart surgery in August of 1987. Albers last saw H.N. in October of 1987. She had made an excellent recovery from her surgery. Her pre-existing heart condition was not related to her head injury or her death. Her heart did not trigger any injury to her brain.

Phillip Immesoete, the coroner's physician for Peoria County, testified H.N. died on January 12, 1988, at 2:30 p.m. He performed an autopsy the next day. Brain swelling caused herniation of the brain to the foramen magnum, the opening in the skull, resulting in death. In Immesoete's opinion, H.N. had been shaken, causing her death. However, he could not rule out the possibility of a blow to one side of her head.

A tape-recorded statement, which defendant made on January 11, 1988, was introduced. Defendant stated he disciplined H.N. by shaking her and making her stand in a corner. He did not beat, hit, or batter H.N. He was upset on January 11, 1988, as he had not visited with his natural daughter, who had the same first name as H.N., he was unemployed, his unemployment compensation had run out, and Lisa had lost her job. H.N. screamed whenever her mother, Lisa, left. On January 11, 1987, Lisa left to pick up dinner. H.N. started to cry and make faces. Defendant followed her into her bedroom to talk to her, but she would not answer him. He then shook her by the arms no more than five times and told her to answer when she was asked something. Her head did not hit anything. Defendant left H.N. in the bedroom and went to prepare pop for dinner. When he returned, H.N. was lying on the floor gasping for air. Defendant stated there was food in her mouth.

Woodward testified defendant made another statement, admitted he was upset on January 11, 1988, and that he shook the child harder than he should have. He went back to check on her because he knew he had hurt her. On January 13, 1988, defendant requested to talk with officers again. He wanted to show them what had happened. The interview was videotaped.

In the videotape, defendant again stated he was tense and upset when he disciplined H.N. He believed he shook her harder than he should have. H.N. was in her bedroom when her mother left. She came out, saw defendant in the kitchen, and went back to her bedroom. He followed her and saw she was making faces. She was not actually making any noise. She agreed she was making faces when he

asked her. While he was standing, he grabbed her arms and told her she was not supposed to do that. At the time he did not think he had shaken her that hard. Later, he regretted shaking her and wanted to make up to her, so he returned to the bedroom. H.N. was on the floor. Defendant tried to get her to stand, but she could not. He might have injured her head while trying to revive her. Defendant then demonstrated how he shook H.N.

Lisa Norman testified H.N. was 2½ years old on January 11, 1988. Defendant moved in with Lisa in August of 1987. H.N. had a heart defect. Her last surgery was in August of 1987. After the surgery, H.N. seemed to bruise more easily. Lisa stated she spanked H.N. on the bottom but did not bruise her. However, when defendant spanked H.N., he bruised her. When Lisa left the house, H.N. would cry. She and defendant discussed this problem. Defendant would tell H.N. to stop and spank her. At the beginning of December 1987, Lisa noticed a bruise on the left side of H.N.'s face near her jaw. When Lisa confronted defendant, he said he had slapped her.

On January 11, 1988, H.N. had a small bruise under her chin. H.N. was in her room when Lisa left to pick up dinner. When Lisa returned, the police were at the house. H.N.'s left ear was not bruised before Lisa left that afternoon. The large bruise on her chin was not there either. Lisa had not seen the bruises on H.N.'s buttocks until arriving at the emergency room.

William Hannigan, a neurosurgeon specializing in pediatric neurosurgery, testified that "Tin Ear Syndrome" is the stage of injury between "Shaken Child Syndrome" and adult impact injury. It combines both a blow and shaking, with rotation of the head to cause injury. His article on the syndrome was five to six months old and had resulted from a study of three children with similar injuries and histories. All had ear bruises, similar CAT scans, and retinal hemorrhaging. None had skull fractures or ruptured eardrums. All had subdural hematomas and swelling on the side of the blow. No coup or contrecoup injuries were present. Over objection, Hannigan testified that the case histories in each situation were similar. Usually, nothing explained the severe injury and a male, recently attached to the family, was involved.

Hannigan was familiar with H.N.'s treatment. He confirmed the diagnosis of brain death. Hannigan believed H.N. suffered from "Tin Ear Syndrome," which may have been bilateral. The relatively small size of the bruises on her ears did not make them insignificant. The impact would rotate the skull so it would not fracture. However, it would cause injury. In Hannigan's opinion, the extent of the force

shown on the videotape could not have caused the injuries which resulted. Hannigan admitted severe shaking alone could have caused the injuries, but that was not probable.

Petra Warren, a family practice specialist, stated she was H.N.'s doctor. She was called to the hospital on January 11, 1988. Warren did not believe the left ear bruising indicated H.N. had received a blow to the head. However, it occurred to her that H.N. might have been hit. H.N.'s injuries were not inconsistent with a severe blow to the head, nor were they inconsistent with shaking.

Edmond Donoghue, a forensic pathologist, studied the records in the instant case. H.N.'s post-operative reports indicate she was cyanotic and had clotting problems. H.N. had DIC when she entered the hospital. The bruises on her left ear were a manifestation of blood disorders. Donoghue became familiar with "Tin Ear Syndrome" in connection with this case. He did not think a 70-pound blow or shaking would cause trivial bruising. Donaghue believed H.N. died from being shaken. The shaking demonstrated by defendant on the videotape could have caused the injuries.

■■ ■ Defendant argues he was not proved guilty beyond a reasonable doubt because the evidence was circumstantial and the State's experts admitted the injuries could have been caused by shaking. Defendant contends the proof was insufficient that his actions were "knowing" if injury resulted from shaking alone. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) In assessing a reasonable doubt argument, the reviewing court does not retry the defendant. (*Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.) The reviewing court must review the evidence in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Pace* (1987), 163 Ill. App. 3d 1012, 517 N.E.2d 299; *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 528 N.E.2d 1371.) Determination of credibility of witnesses is a jury function. (*Collins*, 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Johnson* (1988), 170 Ill. App. 3d 828, 525 N.E.2d 546.) A jury may accept or reject an expert's testimony. A jury may also disregard an expert's conclusion. (*People v. Grice* (1984), 121 Ill. App. 3d 567, 459 N.E.2d 1122.) A conflict between experts does not necessitate a finding that the evidence was insufficient to support a conviction. *People v. Hendricks* (1986), 145 Ill. App. 3d 71, 97, 495 N.E.2d 85, 103.

Meinzen and Rossi testified that H.N. received a blow to the left

side of her head, injuring her brain, and causing her eventual death. Both based their opinions on the bruising to that ear, the CAT scan, which initially showed a large amount of swelling on the right side, and H.N.'s physical symptoms of increasing pressure on one side of the brain, then increasing pressure on all sides of the brain. Both admitted, however, that shaking could possibly have caused the brain injury. Hannigan stated H.N. was hit on the left and possibly on the right ears. The blow or blows plus the rotation of her head combined to effect the brain injury.

Warren testified she did not believe ear bruises were significant enough to indicate a blow to the head. She noted H.N.'s injuries were not inconsistent with shaking, nor were they inconsistent with a severe blow. Donoghue testified the bruises were caused by bloodclotting disorders. He also thought the bruises were a manifestation of the failure of H.N.'s vascular system. In his opinion, H.N.'s injuries were caused by shaking.

Immesoete stated on direct examination that shaking caused the brain injury which led to H.N.'s death. He could not rule out a blow to the side of the head. In rebuttal, Immesoete stated that either or both could have caused the trauma.

■ The inability of the State's experts to totally rule out shaking or a combination of a blow and shaking as the cause of the brain injury does not create a reasonable doubt. The jury could properly consider the facts upon which the experts based their opinions and determine whom to believe. The jury could have concluded Rossi and Meinzen were more believable. An expert's opinion need not be absolutely certain to be believable. Additionally, defendant was charged with various offenses based upon "shaking and hitting" the victim. The jury could have determined that both occurred and that, under the circumstances of the case, such conduct indicated a knowing mental state on defendant's part.

Defendant next argues the trial court erred in refusing to define the term "knowingly." Defendant contends questions submitted by the jury to the court evidenced the jury's confusion about the mental state. Therefore, defendant contends the court erred in refusing to instruct the jury. The trial court instructed the jury on first degree murder and aggravated battery. Both instructions stated defendant had to "knowingly" hit or shake the victim. The court instructed the jury on involuntary manslaughter and that involuntary manslaughter applied to counts I and II.

While deliberating the jury sent three questions to the court. Question one requested a definition of "battery," which was given. In

question two, the jury indicated a split existed among them. The jury asked whether an involuntary manslaughter conviction ruled out an aggravated battery conviction. The court instructed the jury to continue deliberating. Defense counsel agreed with this instruction.

The next day the jury submitted this question:

"Can we legally reach a verdict of Involuntary Manslaughter on either count I or count II and also reach a *guilty* verdict on count III and count IV?" (Emphasis in original.)

The trial court told the jury that verdicts of guilty of involuntary manslaughter to either count I or II and guilty to either count III or IV would be inconsistent, as one involves reckless acts and the other knowing acts. The court then told the jury which verdict combinations would be consistent.

■ Ordinarily, a jury need not be instructed on the term "knowingly" because it has a plain meaning within the jury's common knowledge. (*People v. Powell* (1987), 159 Ill. App. 3d 1005, 512 N.E.2d 1364.) However, where the jury raises an explicit question on a point of law arising from facts about which there is doubt or confusion, the court should attempt to clarify the issue in the minds of the jury members. (*People v. Doe* (1988), 175 Ill. App. 3d 371, 529 N.E.2d 980; *People v. Brouder* (1988), 168 Ill. App. 3d 938, 523 N.E.2d 100.) In *Brouder*, the jury stated it was confused about the term "knowingly resistance [*sic*]." (168 Ill. App. 3d at 946.) It specifically asked the court twice to define "knowingly." The trial court told the jury to continue deliberating. The appellate court held that this was reversible error as the court had a duty to reinstruct on any question of law giving rise to doubt or confusion.

■ In the instant case, the jury did not specifically request an instruction on the term "knowingly." Therefore, *Brouder* does not control. Additionally, the jury questions indicated a split of belief existed among the jury about whether defendant had acted knowingly or recklessly. The jury was evaluating its options given the split. Contrary to defendant's argument on appeal, asking whether an involuntary manslaughter conviction "ruled out" an aggravated battery conviction indicates the jury grasped the distinction between knowing conduct and reckless conduct. The trial court did not err in refusing to instruct the jury on the definition of "knowing conduct." *Powell*, 159 Ill. App. 3d 1005, 512 N.E.2d 1364.

Defendant next argues that under the facts of this case the jury should have been instructed that involuntary manslaughter is an included offense of felony murder based upon aggravated battery. Defendant argues this would have allowed the jury to find he acted

recklessly rather than knowingly. The State argues that no independent mental state is necessary to convict a defendant of felony murder, and involuntary manslaughter is not an included offense.

■■ An included offense is an offense "which is established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." (Ill. Rev. Stat. 1987, ch. 38, par. 2—9(a).) Section 9—1(a)(3) of the Criminal Code of 1961 (Code) provides that a person who kills another commits first degree murder if, in performing the acts which cause the death, he is committing or attempting to commit a forcible felony. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3).) By definition, the term "forcible felony" includes aggravated battery. (Ill. Rev. Stat. 1987, ch. 38, par. 2—8.) Aggravated battery is defined as "intentionally or knowingly caus[ing] great bodily harm, or permanent disability or disfigurement" in the course of a battery. (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a).) Conviction for felony murder does not require proof of an independent mental state. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3); see also Illinois Pattern Jury Instructions, Criminal, No. 7.02 (1968).) Technically, therefore, involuntary manslaughter, which involves a reckless mental state, cannot be an included offense of felony murder. See *People v. Ellis* (1981), 93 Ill. App. 3d 981, 418 N.E.2d 88; *People v. Weathers* (1974), 18 Ill. App. 3d 338, 309 N.E.2d 795; contra *People v. Golden* (1975), 29 Ill. App. 3d 502, 331 N.E.2d 134.

In *Ellis*, which followed *Weathers*, the defendant argued the court erred in refusing to instruct the jury on involuntary manslaughter as an included offense of felony murder. The court stated no mental state was necessary for felony murder; therefore, it is impossible for one committing a homicide during the course of a forcible felony to be guilty of manslaughter. (*Ellis*, 93 Ill. App. 3d 981, 418 N.E.2d 88.) A death in the course of a forcible felony is deemed murder to deter the causing of death in these circumstances. Even an "accidental" death in the course of a felony is deemed murder. (See Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments—1961, at 19 (Smith-Hurd 1979).) Instructing on involuntary manslaughter, thus building in recklessness as a mental state, would defeat the purpose of the statute and render felony murder based upon knowing aggravated battery identical to murder as charged in section 9—1(a)(2) of the Criminal Code of 1961. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2).

However, it requires proof of all of the elements of the predicate felony. (*People v. Land* (1988), 169 Ill. App. 3d 342, 523 N.E.2d 711.) The predicate felony must involve knowing or intentional conduct.

(*Land*, 169 Ill. App. 3d 342, 523 N.E.2d 711.) Involuntary manslaughter involves a reckless mental state. Ill. Rev. Stat. 1987, ch. 38, par. 9—3(a); *Land*, 169 Ill. App. 3d at 355, 523 N.E.2d at 718.

■ Defendant argues the jury should have been allowed an opportunity to find he acted with a less culpable mental state on counts III and IV. However, here, defendant could not by definition have recklessly committed aggravated battery. If the jury determined defendant acted recklessly, it would have had to return a not guilty verdict on both felony murder and aggravated battery. Therefore, the jury could have considered recklessness as a mental state in conjunction with counts I and II and rejected it. However, a recklessness verdict on the felony murder count would have negated the mental state necessary to find defendant committed the predicate felony for felony murder.

Defendant next argues the verdicts of not guilty of first degree murder as charged in count II and guilty of two counts of first degree murder based upon aggravated battery and aggravated battery of a child are legally inconsistent. He maintains the mental state is the same for each offense. Therefore, an acquittal of knowingly creating a strong probability of death or great bodily harm necessarily is legally inconsistent with conviction of engaging in conduct while knowing it would cause great bodily harm. Defendant contends the felony murder convictions must be reversed.

Count II charged defendant with murder pursuant to section 9—1(a)(2) of the Code. Section 9—1(a)(2) of the Code states that a person commits first degree murder if, in performing acts which cause death, he "knows that such acts create a strong probability of death or great bodily harm to that individual or another." (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2).) The jury was instructed that to sustain the charge as to count II, the State must prove, "first, that the defendant performed the acts which caused the death of [H.N.]" and "second, that when the defendant did so, he knew that his acts created a strong probability of death or great bodily harm to [H.N.]."

Counts III and IV charged defendant with first degree murder pursuant to section 9—1(a)(3) of the Code. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3).) Defendant's conviction of felony murder pursuant to count IV is not at issue in this appeal since no sentence was entered upon it. The jury was instructed that to sustain the charge under count III, the State must prove:

> "First, that the defendant performed the acts which caused the death of [H.N.]" and "second, that when the defendant did so, he was committing the offense of aggravated battery."

The jury was instructed that to sustain the charge of aggravated battery, it must find that "defendant knowingly caused great bodily harm to H.N."

■ Legally inconsistent verdicts are verdicts where the same essential element of each crime is found to exist and not to exist and both crimes arise out of the same set of facts. (*People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233; *People v. Jones* (1988), 174 Ill. App. 3d 737, 528 N.E.2d 1363.) Legally inconsistent verdicts are invalid and the convictions must be reversed. (*People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335.) However, a jury may acquit a defendant on one or more counts on a multicount indictment in the belief that the count on which it convicted the defendant will provide sufficient punishment. *People v. Robinson* (1986), 147 Ill. App. 3d 131, 497 N.E.2d 862.

■ Defendant asserts that first degree murder as charged in count II was a different crime than first degree murder as charged in count III. Section 9—1 of the Code presents several different theories which constitute the single offense of first degree murder. (*People v. Stalions* (1986), 139 Ill. App. 3d 1033, 488 N.E.2d 297; see also Ill. Ann. Stat., ch. 38, par. 9—1, Committee Comments—1961, at 12-20 (Smith-Hurd 1979).) Separate offenses of first degree murder were not charged in the instant case. The cases which defendant relies upon are those on which the acquittal of one crime is held legally inconsistent with the conviction of a different crime rather than the same crime. (See *Hoffer*, 106 Ill. 2d 186, 478 N.E.2d 335; *People v. Frias* (1983), 99 Ill. 2d 193, 457 N.E.2d 1233.) The same considerations do not apply when only one offense is charged in various fashions and the jury convicts defendant of some charges but not all of the counts. (See *Stalions*, 139 Ill. App. 3d 1033, 488 N.E.2d 297.) In such a case, the jury may acquit defendant on one or more of the counts on the belief that the count of which it convicted him provides sufficient punishment. *Robinson*, 147 Ill. App. 3d 131, 497 N.E.2d 862.

Defendant next argues Hannigan should not have been permitted to testify about "Tin Ear Syndrome" as an explanation for the symptoms displayed by H.N. Defendant contends the theory was not generally accepted in the medical profession. Therefore, it did not meet the *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070, criteria for admissibility. Prior to testifying before the jury, Hannigan testified he was a pediatric neurosurgeon and professor of neurosurgery. The focus of his work for the prior four years had been pediatric trauma cases. In 1987, he published an article called "Tin Ear Syndrome, Ro-

tational Acceleration in Pediatric Head Injuries," in Pediatrics, a medical journal. Dr. Hale Regate, a neurosurgeon, had presented an abstract at a symposium. Regate agreed with Hannigan's conclusions. The abstract was in the process of publication. Hannigan stated he studied three cases involving similar injuries and formulated a theory from these cases. There are many areas of dispute within "Shaken Child Syndrome." "Tin Ear Syndrome" fills in gaps.

 An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and his testimony will assist the trier of fact. In rendering an opinion, the expert must rely on scientific theories which have gained general acceptance in the field. *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569 (pink tooth theory on cause of death was admissible); *Baynes*, 88 Ill. 2d 225, 430 N.E.2d 1070 (results of polygraph test inadmissible); *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, 1014 (lie detector test inadmissible).

Some courts have applied *Frye* and *Baynes* to determine the admissibility of all scientific evidence, regardless of its type. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733.) Other courts, however, have relaxed the restrictions in *Frye*. In *United States v. Stifel* (6th Cir. 1970), 433 F.2d 431, the court admitted the results of neutron activation analysis. It noted the procedure was new but it found the procedure was also reliable. The court noted the decision as to admissibility was within the trial court's discretion, disputes about the methodology used went to the weight, the newness alone did not make the technique inadmissible, and every theory must have its first day in court.

In *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350, the court admitted testimony about bite-mark identification. *Milone* argued the technique had not gained general acceptance in the scientific community. The court noted that *Frye* and similarly *Baynes* dealt with expert testimony based upon results gained from an intermediate mechanical test. It found where direct observation was involved, as long as the methodology was proved, the testimony was admissible. See also *People v. Jennings* (1911), 252 Ill. 534, 96 N.E. 1077; *Hendricks*, 145 Ill. App. 3d 71, 495 N.E.2d 85; *Columbo*, 118 Ill. App. 3d 882, 455 N.E.2d 733; contra *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 526 N.E.2d 525.

 Here, Hannigan's theory was new. However, one other person had presented a discussion on the theory at a symposium and an abstract was in the process of publication. Hannigan's paper had been published. The symptoms he observed and tests he made to reach his

conclusion were based upon methods accepted by everyone. The clinical examination of the subjects and methodology was not new. Finally, the theory was an outgrowth of anomalies found in "Shaken Child Syndrome," which is widely written about. No error occurred in admitting the testimony.

For the above reasons, we affirm the trial court.

Affirmed.

SPITZ and GREEN, JJ., concur.