*In re* W.D., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v. W.D., a Minor, Respondent-Appellant).

First District (5th Division) No. 1—87—2490

Opinion filed February 16, 1990.

Randolph N. Stone, Public Defender, of Chicago (John Kennedy and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Jane E. Loeb, and David P. Gaughan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

On April 8, 1987, a petition for adjudication of wardship was filed in the circuit court of Cook County, juvenile division, alleging that W.D. was a delinquent minor (Ill. Rev. Stat. 1985, ch. 37, par. 702—2), because he had committed the offenses of aggravated battery and the unlawful use of a weapon. Following an adjudicatory hearing, the trial

judge found W.D. delinquent as charged. At a later dispositional hearing, W.D. was made a ward of the State and recommitted to the juvenile division of the Department of Corrections, where he had been placed following a prior adjudication on unrelated charges. The minor appeals.

On appeal, W.D. raises two issues for our consideration. He contends (1) that failure of the prosecution to effect service of summons on him prior to trial, as required by section 4—3 of the Juvenile Court Act (Ill. Rev. Stat., 1987 Supp., ch. 37, par. 704—3), deprived the trial court of subject matter jurisdiction over the proceedings and rendered all subsequent orders void; and (2) that certain evidentiary rulings of the trial judge during cross-examination of State's witnesses constituted prejudicial error which violated his sixth amendment right to confront witnesses against him (U.S. Const., amend. VI). He requests that the trial court's orders be reversed and the case remanded for a new trial.

We first address the jurisdictional question raised by minor respondent. The record reveals that a probable cause hearing in this case was held on April 8, 1987. At this time W.D., with his aunt and custodian, Dorothy S.,[1] were present in court. The public defender accepted appointment as W.D.'s counsel, waived the reading of the petition, and stipulated to the jurisdiction of the juvenile court. On the same date, Dorothy S. signed a waiver and consent document by which she waived, on behalf of herself and W.D., service of summons and any defects in service of process, and consented to the jurisdiction of the juvenile court. The trial judge ordered that W.D.'s mother, who resided at a known address in Milwaukee, Wisconsin, be served with summons by certified mail. There was a finding of "no contact" with W.D.'s father, whose address was unknown.

The trial commenced on April 22, 1987, with minor respondent and his mother present in court. W.D. was also before the court for all subsequent proceedings, including further trial proceedings on May 4, 1987, and the conclusion of the trial on May 7, 1987, when the court found him delinquent as charged. As proceedings opened on May 7, the court appointed the public defender as guardian *ad litem* for W.D., having been informed that his mother was not present and was apparently ill in Milwaukee.

Throughout the course of the trial, neither W.D. nor his attorney

---

[1]In order to protect the identity of minor respondent, first names and surname initials will be used throughout this opinion to designate the participants in these proceedings, with the exception of the attorneys and the investigating police officer.

raised any objection based on lack of service on minor respondent. However, it appears from the record that service of petition and summons on W.D. did not take place until July 10, 1987, after the trial had concluded and while he was in custody pending the dispositional hearing. On that date, the public defender filed a written motion to dismiss on the ground that W.D., a named respondent, had not been personally served prior to trial as required by the Juvenile Court Act, and that this omission rendered void all subsequent court orders, including the adjudication of delinquency.

The dispositional hearing, as rescheduled, was held on July 24, 1987. W.D.'s mother, after proper and timely notice, had been excused from attendance at this and any further proceedings upon her own in-court request. Minor respondent appeared at the hearing with counsel, and the public defender was again appointed his guardian *ad litem*. Following arguments, the court denied W.D.'s motion to dismiss and proceeded with the dispositional hearing, at the conclusion of which it entered an order adjudicating wardship and recommitting W.D. to the Department of Corrections.

At the time of the filing of the petition in this case, section 4—3 of the Juvenile Court Act of 1965,[2] as amended, provided in pertinent part:

> "When a petition is filed, the clerk of the court shall issue a summons with a copy of the petition attached. The summons shall be directed to the minor's legal guardian or custodian and to each person named as a respondent in the petition." (Ill. Rev. Stat., 1987 Supp., ch. 37, par. 704—3(1).)

This section was subsequently amended by the legislature to provide that summons need not be directed to a minor respondent under eight years of age for whom an appointed guardian *ad litem* appears at proceedings. In a recent decision, this court applied the 1988 amendment retroactively to govern juvenile proceedings which commenced in 1986 (*In re R.W.* (1988), 176 Ill. App. 3d 868, 531 N.E.2d 924), adopting the approach of the supreme court in *In re Pronger* (1987), 118 Ill. 2d 512, 517 N.E.2d 1076 (applying retroactively the previous amendment to section 4—3(1)). We therefore see no reason why the 1988 language should not apply here. However, regardless of whether the 1987 or the 1988 language governs, the fact that W.D. was over

---

[2]Public Act 85—601 repealed the Juvenile Court Act enacted in 1965 and adopted the Juvenile Court Act of 1987, effective January 1, 1988. (See Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.* (Pub. Act 85—601).) The prior act and its subsequent amendments are pertinent to this appeal because the petition was brought while the prior Act was still in effect.

eight years of age is not determinative of the jurisdictional issue in this case.

Minor respondent contends that failure to timely serve him rendered all subsequent court orders void due to a consequent lack of subject matter jurisdiction. We have examined the cases cited by minor respondent to support this contention and have found them inapposite, as the effect of any failure of service, as explained below, is determined by his own waiver of that requirement.

■ ■ Initially, we observe that jurisdiction of the subject matter "is the power to adjudge concerning the general question involved, and if a complaint states a case belonging to a general class over which the authority of the court extends, the jurisdiction attaches." (*In re Vaught* (1981), 103 Ill. App. 3d 802, 803, 431 N.E.2d 1231, 1232, quoting *Wood v. First National Bank* (1943), 383 Ill. 515, 522, 50 N.E.2d 830, 834.) In Illinois, the circuit courts have original jurisdiction of all justiciable matters. (Ill. Const. 1970, art. VI, §9; *In re Sexton* (1981), 84 Ill. 2d 312, 319-20, 418 N.E.2d 729, 733.) The Juvenile Court Act further provides that proceedings concerning delinquency of minors are justiciable in the circuit courts. (Ill. Rev. Stat. 1985, ch. 37, par. 702—1; Ill. Rev. Stat. 1987, ch. 37, par. 805—1.) A "delinquent minor," for purposes of such proceedings, is defined as "any minor who prior to his 17th birthday has violated or attempted to violate, regardless of where the act occurred, any federal or state law or municipal ordinance." (Ill. Rev. Stat. 1985, ch. 37, par. 702—2; Ill. Rev. Stat. 1987, ch. 37, par. 805—3.) W.D., a 16-year-old respondent charged with violating two State criminal statutes, clearly falls within this definition. Furthermore, this court has stated that while the Juvenile Court Act dictates the procedures to be employed in certain proceedings, such as those pertaining to service of process, the mandatory nature of the provision is not necessarily a limitation on the court's subject matter jurisdiction. (*In re Vaught* (1981), 103 Ill. App. 3d 802, 804, 431 N.E.2d 1231, 1232-33.) Therefore, we believe that the trial court had subject matter jurisdiction over W.D.'s delinquency proceedings and that the jurisdictional issue before us relates solely to personal jurisdiction.

■ ■ Jurisdiction of the person is the court's power to bind a particular person to its judgment and requires in part that the defendant be given sufficient notice. (*In re Vaught* (1981), 103 Ill. App. 3d 802, 804, 431 N.E.2d 1231, 1233.) The provisions of the Juvenile Court Act relating to service upon minors, custodians, and legal guardians provide a method for implementing the basic constitutional requirements of due process and fairness. (See *In re Application of*

*Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428.) However, as this court has stated on two recent occasions, under similar facts, where a juvenile or any named respondent appears before the court and participates in the proceedings, he waives the formality of service of process and voluntarily submits to the jurisdiction of the court. (*In re T.O.* (1989), 187 Ill. App. 3d 970, 543 N.E.2d 969 (15-year-old respondent, charged with aggravated battery, unlawful use of a weapon and other offenses, waived any challenge to court's jurisdiction when he appeared and participated in proceedings, represented by counsel and with parents having actual notice and often in attendance, although he was never formally served); *People v. D.J.* (1988), 175 Ill. App. 3d 491, 529 N.E.2d 1048 (minor respondent over eight years of age, charged with aggravated battery, who appeared before the court and was represented by public defender, entered an admission, and was committed to Department of Corrections, thereby waived any challenge to court's jurisdiction over his person). See also *People v. Land* (1988), 169 Ill. App. 3d 342, 523 N.E.2d 711 (by appearing before the court on numerous occasions, represented by counsel, without objection until summons was later served as he was transferred to criminal court for prosecution as adult, minor submitted to juvenile court's jurisdiction).) Likewise, in the instant case, the minor respondent appeared, was represented by counsel, and was present throughout all proceedings. His mother had actual notice of the proceedings and attended some of them, while respondent was represented by a court-appointed guardian *ad litem* in her absence. No objection was raised to the court's jurisdiction until after the trial. Further, there is no evidence that W.D. lacked actual notice of the charges against him prior to trial. His own attorney waived the reading of the petition in open court. Finally, there is nothing in the record indicating that failure of timely service prejudiced W.D., his mother, or any other party to this case. We therefore hold, consistent with the above-cited authority, that the trial court had jurisdiction to enter its orders respecting the interest of minor respondent, who, by his own actions, waived any jurisdictional challenge based upon failure of timely service.

We next turn to the more difficult issue of whether evidentiary errors at trial resulted in a denial of minor respondent's constitutional right to confront witnesses against him. W.D.'s three-count delinquency petition alleged the following criminal violations: (1) aggravated battery causing great bodily harm (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a)); (2) aggravated battery while armed with a deadly weapon (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(b)(1)); and (3) unlawful use of a weapon, specifically, a knife with an eight-inch blade (Ill. Rev.

Stat. 1985, ch. 38, par. 24—1(a)(2)). The incident giving rise to these charges was an altercation involving four teenaged boys in W.D.'s Chicago neighborhood. At the adjudicatory hearing, the State presented the testimony of the complaining witness, his sister, who was an eyewitness, and an investigating police officer. The defense presented three witnesses, all present at the scene of the incident. W.D. did not testify.

Eric J. (Eric), the 15-year-old complaining witness, testified that about 4:30 p.m. on April 7, 1987, he was playing basketball near the intersection of Homan and Ohio Avenues in Chicago. His friend, John V. (John), appeared at this location and informed Eric that Eric's sister was involved in a fight nearby. Eric and John then walked to the area where the fight was supposedly occurring, and where Eric observed John hit a boy known to him as "Pee Wee." Pee Wee was later identified as Robert D., a cousin of minor respondent. Eric next saw Robert D. (Robert) "pull a knife on John," and responded by hitting Robert once in the face, using his fist. Eric stated that he was not carrying a razor or any other weapon at the time. After Eric hit him, Robert fell to the ground, and Eric stepped back. Eric stated that he immediately felt pain in his lower back. At that point, he could see W.D., whom he had known for about five years, standing approximately two feet away. There was no one standing between Eric and W.D. Then W.D. "ran," and as Eric crossed the street, a friend told him that his back was bleeding. Eric went directly to the home of his aunt, who notified his mother. Eric's mother then took him to Franklin Boulevard Hospital, where he was treated in the emergency room and remained hospitalized for two days. Following this testimony, Eric indicated for the court a scar on his back, approximately 1 inch to 1½ inches long. It was described for the record as a stab puncture wound located two inches to the right of the spine, about the waist.

On cross-examination, Eric recalled that when he arrived at the location where his sister had supposedly been fighting, and where the altercation between John and Robert occurred, about 50 people were already standing around, watching. Eric understood at the time that the crowd had congregated to watch an earlier fight between girls. Some boys at the scene told him that "Pee Wee" had hit Eric's sister, but Eric decided to let Pee Wee (Robert D.) and John fight, and not to "jump in it" himself. However, when he saw "Pee Wee pull the knife on John," Eric hit him. Eric's testimony on cross-examination was somewhat confused and conflicting. At one point he stated that Pee Wee pulled out a belt while fighting with John, and that after John hit Pee Wee, Pee Wee was also going to pull a knife out, so Eric

hit him. Yet, Eric twice answered "no" to the question, "Did you see John hitting Pee Wee?" When asked if John had a bottle in his hand, he answered, "I don't know. I guess so."

Kareyonai J. (Kareyonai), Eric's 13-year-old sister, testified that about 4:30 p.m. on April 7, 1987, she was standing near the intersection of Homan and Ohio, with a crowd of about 50 other people, when she saw Eric walking with his friend John V. Pee Wee (Robert) and W.D. were walking behind Eric and John. John turned around and hit Robert once, with his fist. Then Robert "reached into his left side and pulled out a knife." Eric then hit Robert once, with his fist. At this point, Eric "stepped back," and W.D. stabbed Eric with a knife. Kareyonai stated that at the time she observed her brother being stabbed, she was about five feet away from Eric and W.D. She described the weather as "sunny," and further stated that no persons or other obstacles blocked her view. She testified that she saw the knife used to stab her brother, and indicated its length as between six and eight inches long. She also made an in-court identification of W.D., whom she had known for five years at the time of the incident, as the person who stabbed her brother. Kareyonai further testified that after the stabbing, both Robert and W.D. "ran," but she left the scene and did not follow them.

On cross-examination, Kareyonai recalled that Eric had not been at this location, where she and a large crowd had gathered earlier to watch two girls fighting, until John V. left the area and then returned with Eric. Kareyonai also stated that when the fight involving her brother occurred, John did not have a bottle in his hand. After John hit Robert, Robert pulled his knife from his belt buckle. She described Robert's knife as about six to eight inches long. She further testified that although there were adults among those in the crowd, no one attempted to intervene. Having stated that when Eric "stepped back," W.D. "pushed the knife up," Kareyonai was asked by defense counsel where Pee Wee (Robert) was at this time. She answered that Pee Wee was "over there where John was," and twice answered "no" when asked if Pee Wee was on the ground. She further stated that she did not see what John was doing at this time; she was looking at her brother. The following colloquy, which is the first instance complained of by minor respondent, then occurred:

"MR. FINKLE [Defense attorney]: Did you see what Pee Wee was doing?

MS. FEIGER [Assistant State's Attorney]: Objection. Asked and answered.

MR. FINKLE: Your Honor, I am just trying to find out. He

stepped back. I am trying to find out what from. What he stepped back into.

THE COURT: Sustained.

MR. FINKLE: From what did your brother Eric step back?

MR. DILLON [Assistant State's Attorney]: Objection.

THE COURT: Sustained.

MS. FEIGER: Speculative.

MR. FINKLE: What is your Honor's basis for sustaining the objection?

THE COURT: Move on to your next question, counsel."

Kareyonai then testified that her brother Eric "walked to [her] auntie's house" after he was stabbed, but she did not follow him there or accompany him to the hospital.

Chicago police officer John Rowski testified that he was assigned to investigate an aggravated battery about 6 p.m. on April 7, 1987, and that he and two partners interviewed Eric J. in his room at Franklin Boulevard Hospital at approximately 8 p.m. Officer Rowski stated that during this interview, Eric gave the police a nickname of the person who allegedly stabbed him and an address. The officers then went to a third-floor apartment at the corner of Ohio and Homan, where a woman who identified herself as Dorothy S., minor respondent's aunt, answered the door. When the officers explained that they were looking for a boy with a certain nickname, she went to another room in the apartment and returned with W.D. Officer Rowski further stated that there were about seven people in the room at this time, including W.D. and his aunt. Following a conversation, W.D. and an officer recovered a knife from inside the apartment. Minor respondent gave the knife to the officer.

Officer Rowski further testified that he and his partners accompanied W.D. to a stated address on West St. Louis and another stated address on North Hamlin. They then met with Kareyonai J. at a third location. Following this interview, the officers drove W.D. to the police station, where he was read his *Miranda* rights and placed under arrest. Officer Rowski further stated that W.D. made an admission to him at the police station in the presence of two other officers. Direct examination of Officer Rowski then continued:

"Q. What did he [W.D.] say to you?

A. He told me that his cousin by the nickname of Pee Wee was involved in a fight with the victim, Eric J[.] And that during the fight, Eric J[.] was pulling—He was arguing with his cousin and another subject came up to his cousin and gave him a punch to the face. At that time, the victim came up behind

the cousin. At which time he came up behind the victim and stabbed him in the back.

He also stated that during this time the victim was armed with a razor.

Q. Did you recover any razor in your investigation of this case?

A. No."

During cross-examination, Officer Rowski explained that the purpose of the visit to the West St. Louis address with W.D. was to locate John V., but John was not there. Defense counsel next posed a series of questions relating to minor respondent's admission at the police station. The officer stated that W.D. told police that Eric J. and John V. were fighting with his cousin, that Eric came up behind his cousin and "tried pulling him down," and that W.D., who was already on the scene, then came up behind Eric and stabbed him. The following colloquy, representing the second instance of trial error complained of, then occurred:

"MR. FINKLE [Defense attorney]: Did W[.D.] tell you that John V[.] had a bottle?

MS. FEIGER [Assistant State's Attorney]: Objection.

MR. FINKLE: Your Honor, I am going to the statement that W[.]D[.] made. I wish to know if he did.

THE COURT: Rephrase the question if you wish to do so.

MR. FINKLE: What else did W[.]D[.] tell you about what John V[.] did?

MR. DILLON [Assistant State's Attorney]: Your Honor, objection.

THE COURT: He may answer.

A. I don't recall him saying anything else about that particular incident other than him saying John V[.] hit his cousin in the face with his fist.

MR. FINKLE: Did W[.D.] say that John V[.] had waved a bottle at his cousin?

MR. DILLON: Objection.

THE COURT: Sustained.

MR. FINKLE: Did W[.D.] say that anyone had a bottle in his hand?

MR. DILLON: Objection, your Honor.

THE COURT: Sustained.

MR. FINKLE: Didn't W[.D.] say that John V[.] tried to hit his cousin Pee Wee with a bottle in the head?

MR. DILLON: Objection, your Honor.

THE COURT: Sustained."

Officer Rowski was also asked whether W.D. had said that his cousin was bleeding during the incident. The officer stated that, during the conversation in his aunt's apartment, W.D. had pointed to a scratch on Robert D.'s face. According to Rowski, the scratch was "located in the corner near [Robert D.'s] eye" and "appeared to be a finger nail cut." Defense counsel then showed the witness a written police "Supplementary Report," which the witness identified as containing a summary of the statements which W.D. made to police. The testimony continued as follows:

"MR. FINKLE: And did W[.D.] tell you that Eric J[.], the victim, had a razor in his hands?

A. That is what he said, yes.

Q. Did you ever conduct a—Did you ever do an interview with Eric J[.]?

A. Yes.

Q. Did you do a search of Eric J[.]?

A. He was at the hospital.

MR. DILLON: Objection, your Honor, beyond the scope.

THE COURT: Sustained.

MR. FINKLE: And did you ever interview John V[.]?

MR. DILLON: Objection.

THE COURT: Sustained.

MR. FINKLE: Did you ever do a search of John V[.]?

MR. DILLON: Objection.

THE COURT: Sustained.

MR. FINKLE: Were you also informed by W[.D.] that John V[.] had a gun?

MR. DILLON: Objection, your Honor.

THE COURT: Sustained.

MR. FINKLE: Did you ever recover a gun?

MR. DILLON: Objection, your Honor.

THE COURT: Sustained."

At this juncture in the proceedings, defense counsel sought clarification as to the nature of the State's objections and the reasons for the court's rulings on those objections. He further stated, for the record, that he believed the rulings sustaining the foregoing State's objections had no basis in law. The court declined to state reasons for its rulings and directed defense counsel to ask his next question. After testifying that he did not witness any of the altercation in question, Officer Rowski was excused.

The first defense witness was Robert D., 19-year-old cousin of mi-

nor respondent, who stated that his nickname was "Pee Wee." He testified that on April 7, 1987, he was upstairs in his aunt's apartment when a fight between two girls occurred "out back," in a vacant lot, or alley, behind a building near the intersection of Ohio and Homan. He and three cousins, including W.D., went downstairs to watch the fight. As the cousins were watching the fight, along with about 20 others, "John," whose last name he did not know, tried to hit him "behind the head" with a bottle. Robert D. further stated that his aunt, Dorothy S., responded by directing all the cousins to go back upstairs, into the apartment building. Robert went upstairs, but after "about a minute," he went back outside, where he asked John [V.] why he had tried to hit him "behind the head with the bottle." He recalled that John, who was with about four other boys at the time, started talking "all crazy." Again, his aunt intervened, directing Robert D. to come back across the street. John followed Robert D. and Dorothy S. across the street, still "talking crazy." Other boys also arrived on the scene. Robert testified that at that moment, John hit him once, in his forehead, and that "Eric," whom he knew only by first name, hit him from behind. Robert further stated that he knew that it was Eric who had hit him from behind because when he fell down, Eric was standing above him. Eric also cut Robert's face with "something," by the right side of his nose, but Robert testified that he did not know what Eric cut him with. As Robert was getting up, the next thing he saw was W.D. "chasing Eric." Robert then turned back toward John. He further recalled that his Aunt Dorothy intervened at this point and "made [Robert and W.D.] go back upstairs." Later, when the cousins were standing outside on the porch, John returned with some other boys and asked Robert D. if he "wanted to play pistol play." On cross-examination, Robert D. also testified that following the incident, when he returned to his aunt's apartment, he did not know that Eric had been stabbed.

Eddie G., a 30-year-old cousin of W.D., Robert D., and Dorothy S., testified that on April 7, 1987, at about 4 to 4:30 p.m., he and Dorothy were sitting in his parked car, behind her apartment building, conversing. He was in the driver's seat, and Dorothy S. was in the front passenger seat. He recalled that there were some girls fighting nearby. He also observed Robert D., W.D., and "some guys trying to fight Robert." Then, as John [V.] "pulled a bottle behind Robert's head," W.D. told Robert about the bottle, and John "never hit him with it." Eddie G. further stated that at the time these events took place, he was about 20 feet away from Robert and W.D., and had an unobstructed view of the events he witnessed. He next observed

Robert and John engaging in a "heated conversation," and then saw Robert go "back into the house." Eddie G., who remained seated in his car, recalled that he next observed Robert and W.D. walking across the street toward John, where Robert and John confronted each other about their previous conversation. At this point, five other young men, including Eric J., crossed the street to where Robert and John were standing. The witness recalled that the oldest among them was "at least" 24 years of age.

Eddie G. further testified as to what happened next. He stated that he saw John "swing on" Robert, and Eric come around Robert and hit him, pulling Robert down to the ground. He then saw W.D. chasing Eric. He stated that he did not see whether W.D. had anything in his hand. He did not see anyone get stabbed or anyone bleeding. He further testified that while W.D. was chasing Eric, and Robert was "getting up off the ground," the other young men were "still standing there." At that moment, Eddie G. started to exit his car, "because Robert was by himself at the time." However, Dorothy S. got out of the car first. Then the other boys near Robert "just broke away," and the incident ended. Eddie G. further stated that he never lost sight of W.D. as he chased Eric across the street. Eric had just crossed the curb when W.D. "stopped and came back," after his aunt called him. Eddie then got out of his car and went upstairs into Dorothy's apartment. He further testified that about five minutes after the fight had ended, when he and some of his cousins, including W.D., were on the porch of the apartment building, John walked up to the building with his right hand in his pocket. John "stood there for about five minutes," and then left. When asked if he ever saw Eric again, Eddie G. responded, "Not until the following day."

Dorothy S. testified that about 4:30 p.m. on April 7, 1987, she was seated in a parked car in an alley close to her apartment building on Homan Avenue, along with her cousin, Eddie G. She recalled that about 15 or 20 persons were watching a fight between two girls, and that she observed W.D. and Robert D. standing among the crowd watching the fight. At some point, she saw Robert cross the street and begin speaking with "John," whose last name she did not know. She then exited the car, crossed the street, and told Robert to come back to the other side of the street. Dorothy S. further testified that John followed Robert and herself back across to the side of the street nearer her apartment, whereupon John and Robert began arguing. At this time, Dorothy S. observed "Eric," whom she knew only by first name, come across the street and hit Robert, who fell to the ground. Eric stood over Robert, behind him, while John stood in front of

Robert, who was on the ground. W.D. then came from behind Eric. The next thing that Dorothy S. observed was W.D. and Eric "run[ning] down the street." However, she stated that after two or three minutes, she was able to get both W.D. and Robert to go back upstairs into her apartment. On cross-examination, Dorothy S. testified that she had known both John and Eric for about two years. She further stated that about one year before this incident, both boys had been friends of W.D.

In his closing argument, defense counsel contended that the testimony of Robert D. and other witnesses supported the conclusion that W.D. was acting in defense of his cousin, who was being beaten by two other youths, at the time that he cut Eric J. in the back. While counsel did not dispute, nor is it disputed by W.D.'s counsel on appeal, that minor respondent did in fact cut Eric J. with a knife on the afternoon in question, he argued that this act was justified as defense of another, the use of a knife being a necessary and appropriate use of force under the particular circumstances. He further argued, in regard to the charge of an unlawful use of a weapon, that W.D. obtained the knife for the purpose of aiding his cousin and not with the intent of using it unlawfully, and then immediately replaced it in the family apartment. Defense counsel therefore requested a finding of no delinquency. The State countered with the argument that stabbing a person in the back after only two punches had been thrown was an excessive use of force, that the use of deadly force was not justified under these circumstances, and that, therefore, a finding of delinquency should be entered on all three counts. The court, without further comment, found W.D. delinquent as charged.

■ Before turning to minor respondent's contention that limitations placed on the cross-examination of two State's witnesses effectively denied him his constitutional right of confrontation, we must address the State's argument that W.D. has waived this issue by failing to raise it in a post-trial motion. The State bases its waiver argument on the general rule enunciated by our supreme court in *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130, which requires both a trial objection and a written post-trial motion in order to preserve a question of trial error for appellate review. However, this court has recently rejected the premise that the *Enoch* rule applies to appeals from delinquent minor proceedings under the Juvenile Court Act. (*In re C.L.* (1989), 180 Ill. App. 3d 173, 534 N.E.2d 1330.) As we observed in *C.L.*, the requirement for a written post-trial motion derives from section 116—1(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 116—1(b)). It is not a require-

ment of the Juvenile Court Act. We further stated that we do not construe either Supreme Court Rule 660(a), which provides that appeals from final judgments in delinquent minor proceedings are "governed by the rules applicable to criminal cases," or section 5—18 of the Juvenile Court Act, which states that the "rules of evidence" in criminal proceedings are applicable to delinquency hearings, to require the filing of a post-trial motion in a delinquency case. (107 Ill. 2d R. 660(a); Ill. Rev. Stat. 1987, ch. 37, par. 805—18; *In re C.L.*, 180 Ill. App. 3d at 177, 534 N.E.2d at 1334.) Accordingly, the objections to evidentiary rulings raised by minor respondent's counsel during the adjudicatory hearing suffice to preserve the confrontation issue for review.

Minor respondent points to three instances during cross-examination of State's witnesses when, he contends, testimony was improperly limited by the trial judge. The first occurred when Kareyonai J. was not permitted to answer defense counsel's questions relating to what her brother, Eric, "stepped back from," as W.D. cut him with a knife, and to "what Pee Wee was doing" at that time. The second and third occurred during cross-examination of Officer Rowski relating to W.D.'s admission to police that he stabbed Eric at a time when Eric and John V. were fighting with his cousin, and when Eric had a razor in his hand. The State maintains that the trial judge properly limited the scope of cross-examination because defense counsel's questions had already been asked and answered and because minor respondent "tried to present his defense through the People's witnesses during cross-examination." Alternatively, the State maintains that, even if the trial judge erred on any particular ruling, the error was "certainly harmless based on the abundant evidence of the respondent's guilt." Having reviewed the record in light of the applicable rules of law, we cannot agree with the State's contentions.

■ The sixth amendment (U.S. Const., amend VI) guarantees the right of an accused to confront witnesses against him through cross-examination, a necessary right for a fair trial. (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065; *People v. Campos* (1987), 155 Ill. App. 3d 348, 358, 507 N.E.2d 1342, 1348.) The right to an effective cross-examination extends to juvenile respondents in delinquency proceedings. (*In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428.) The Juvenile Court Act further provides that in considering the question of whether a minor is delinquent, the court will apply the standard of proof and the rules of evidence in the nature of criminal proceedings in this State. (Ill. Rev. Stat. 1985, ch. 37, par. 704—6; Ill. Rev. Stat. 1987, ch. 37, par. 805—18.) Accordingly, we consider the question of whether the trial judge's rulings limiting

cross-examination were error, and if so, whether they were reversible error, under the same rules and standards applicable to a criminal case.

■■ ■ With regard to rulings limiting cross-examination, it is well established that the scope of cross-examination rests largely in the discretion of the trial court, and a reviewing court will overturn its ruling only where there was an abuse of discretion which resulted in manifest prejudice to the defendant. (*People v. Owens* (1984), 102 Ill. 2d 88, 103, 464 N.E.2d 261, 268; *People v. Williams* (1989), 180 Ill. App. 3d 294, 304, 535 N.E.2d 993, 999.) Our review of Kareyonai J.'s testimony leads us to conclude that the trial judge acted within his discretion in limiting cross-examination of this witness. We cannot say that it was error for the judge to sustain the State's objection that Kareyonai had already answered defense counsel's questions. She had just answered that Pee Wee (Robert D.) was "over there where John was," and had twice stated that he was not on the ground. She had also described in some detail the prior sequence of events during the fight. While further clarification might have been permitted, we cannot say that precluding such testimony was an abuse of discretion. However, we reach the opposite conclusion with respect to the limitations placed on defense counsel's cross-examination of Officer Rowski. For reasons which follow, we find that these rulings were error, and that under the particular facts of this case, they constituted reversible error in that they manifestly prejudiced minor respondent's defense.

■■ As a general rule, cross-examination is limited to the subject matter inquired into on direct examination. However, it is well settled that a criminal defendant is entitled on cross-examination to develop all circumstances within the knowledge of a State's witness which explain, qualify, discredit or destroy his direct testimony (*People v. Strother* (1972), 53 Ill. 2d 95, 290 N.E.2d 201; *People v. Provo* (1951), 409 Ill. 63, 97 N.E.2d 802; *People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849), "*although they may incidentally constitute new matter which aids the cross-examiner's case*" (emphasis added) (*People v. Williams* (1977), 66 Ill. 2d 478, 486, 363 N.E.2d 801, 805). Furthermore, it is well established that where a conversation is related by a witness, the opposing party has a right to bring out all of the conversation on cross-examination. (*People v. Weaver* (1982), 92 Ill. 2d 545, 556, 442 N.E.2d 255; *People v. Shelton* (1986), 140 Ill. App. 3d 886, 893, 489 N.E.2d 879.) One cannot introduce a portion of a conversation and then bar the opposing party from bringing out the rest of that conversation. (*People v. Futia* (1983), 116 Ill. App. 3d 68, 72, 452 N.E.2d 109, 112.) The doctrine of completeness permits a party

to introduce the remainder of a conversation or writing in order to explain, qualify, or otherwise shed light on that portion of a statement introduced by an opponent (*People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 438, 505 N.E.2d 1228, 1234), so as to correctly convey its true meaning to the trier of fact (*People v. Hosty* (1986), 146 Ill. App. 3d 876, 884, 497 N.E.2d 334, 339.)

■■ Nonetheless, the State maintains that the trial judge properly limited the scope of respondent's cross-examination of Officer Rowski because respondent's questions were beyond the scope of direct examination. The State further asserts, in its brief submitted to this court, that "rather than impeaching the prosecution's witnesses, respondent attempted to elicit evidence from Officer Rowski during cross-examination which he should have introduced in his case in chief. In doing so, the respondent attempted to undermine the trial process by protecting potential defense witnesses from cross-examination by the People." The State cites no supporting authority for this assertion, which directly contradicts the long-standing rules of evidence stated above. It is clear that all four questions posed by respondent as to whether John V. had a bottle in his hand or used a bottle in a manner threatening to respondent's cousin, Pee Wee, as well as the question about John V. having a gun, related directly to the same conversations between W.D. and Officer Rowski to which the officer had testified on both direct and cross-examination. The questions also related to the same incident which formed the substance of that testimony, an incident during which, as already indicated by the complaining witness, John V. may have had a bottle in his hand. Moreover, these questions were within the proper scope of cross-examination, regardless of whether they potentially aided minor respondent's case, because they were an attempt to develop all circumstances within Officer Rowski's knowledge which would tend to explain, qualify, or discredit his previous account of W.D.'s admission, particularly his statement that he could "not recall" W.D. saying anything about "that particular incident" except that John V. had hit his cousin in the face with his fist. We further note that an attempt to develop or qualify witness testimony in this manner may serve to cast doubt on the credibility of the testimony as well as to clarify its meaning and context for the trier of fact. Moreover, we find the State's contention, that defense counsel failed to set forth an offer of proof which would have indicated that the evidence he sought to elicit from Officer Rowski was competent and relevant, to be without merit. From the officer's remarks about minor respondent's statements to police, and the entire line of questioning which followed during cross-examina-

tion, it was clear that defense of others was going to be an issue, and a proper foundation had thus been laid for examining the witness about W.D.'s statements as they related to the full set of circumstances which W.D. perceived as threatening his cousin. While there was no specific offer of proof as to a bottle or a gun being in John V.'s possession, we believe that the circumstances and the questions themselves sufficiently indicated to the trial judge the purpose and substance of the evidence sought, and that the testimony would have been material to W.D.'s defense. (See *People v. Husted* (1981), 97 Ill. App. 3d 160, 168, 422 N.E.2d 962, 968; E. Cleary & M. Graham, Handbook of Illinois Evidence, §103.7, at 17-18 (4th ed. 1984).) For all of the above reasons, we find that the questions posed relating to the bottle, as well as the subsequent question, "Were you also informed by W[.D.] that John V[.] had a gun?" were proper under the applicable rules of law.

We acknowledge that the instances of error cited cannot be extended to all of the rulings to which minor respondent objects. The preclusion of some questions which ventured into other areas of Officer Rowski's investigation was properly within the sound discretion of the trial judge. Nonetheless, while the number and kind of errors which occurred would not necessarily rise to prejudicial error in every case, they do so here because of the particular combination of facts and legal issues involved, the rather closely balanced factual evidence relating to respondent's defense, and the State's burden to negate that defense beyond a reasonable doubt.

 Defense of another person is an affirmative defense (Ill. Rev. Stat. 1985, ch. 38, pars. 7–1, 7–14; *People v. Torres* (1977), 47 Ill. App. 3d 101, 107, 361 N.E.2d 803, 808), and once it is raised by the introduction of some evidence by either the State or the defense, the State has the burden of proving guilt beyond a reasonable doubt as to that issue, as well as all other elements of the offense. (*People v. Rorer* (1976), 44 Ill. App. 3d 553, 558, 358 N.E.2d 681, 684.) In the instant case, the State's introduction of W.D.'s statement that he stabbed Eric J. when Eric and another boy were fighting with W.D.'s cousin, and that Eric, armed with a razor, had tried to pull his cousin down, was sufficient to raise the issue of defense of others. (See *People v. Rorer* (1976), 44 Ill. App. 3d 553, 558, 358 N.E.2d 681, 684.) Substantial evidence introduced by other witnesses also supports this defense, the elements of which are defined in the Criminal Code of 1961:

> "A person is justified in the use of force against another when and to the extent that he *reasonably believes* that such

conduct is necessary to defend himself *or another* against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself *or another*, or the commission of a forcible felony." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 7—1.)

This court has more specifically delineated the elements justifying the use of force in defense of person as follows: (1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, and (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. Furthermore, the use of deadly force is limited to those situations in which (a) the threatened force will cause death or great bodily harm or (b) the force threatened is a forcible felony. *People v. Williams* (1965), 56 Ill. App. 2d 159, 165-66, 105 N.E.2d 749, 752.

It is clear from the trial testimony, summarized above in some detail in order to present the surrounding circumstances of W.D.'s act as conveyed to the trier of fact, that there was ample evidence for the court to conclude that unlawful force, involving imminent danger of harm, was threatened against minor respondent's cousin by Eric J. and John V., acting in concert, at the time that minor respondent cut Eric in the back. Moreover, there is no evidence suggesting that Robert D. was the initial aggressor in this confrontation. Therefore, the crucial questions for the trial court, assuming it determined that W.D.'s use of the knife in a manner which caused Eric's resulting injury was a use of deadly force, were: (1) whether W.D. actually believed that imminent danger of death or great bodily harm to his cousin existed and that the use of deadly force was necessary to avert the danger, and (2) that if he did so believe, that these beliefs were reasonable. Whether an otherwise criminal act is justified under the law of self-defense depends on all of the surrounding facts and circumstances. (*People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866, 868-69; *In re C.P.* (1986), 141 Ill. App. 3d 1018, 1022, 491 N.E.2d 44, 48.) A defendant is not required to be correct in his assessment of the danger presented by a set of circumstances, and a belief may be reasonable even if he is mistaken. (*People v. Williams* (1965), 56 Ill. App. 2d 159, 166, 205 N.E.2d 749, 753.) The question here is whether the facts as they appeared to W.D. at the time and

under the circumstances there present were such to indicate to him, as a reasonable person, that his cousin was in danger of losing his life or suffering great bodily injury. (See *People v. Duncan* (1924), 315 Ill. 106, 111, 145 N.E.2d 810, 812.) It is also the law in Illinois, as in many other jurisdictions, that a person defending another stands in the other's shoes and may do whatever the other would be justified in doing to defend himself. (*People v. Forte* (1915), 269 Ill. 505, 510, 110 N.E. 47, 48-49; See 1 S. Wharton, Criminal Evidence §168 (14th ed. 1985).) The evidence presented in this case must be considered in light of the foregoing principles.

Several conclusions may safely be drawn from the trial record before us: (1) that the evidence which was admitted overwhelmingly supports a determination that W.D. committed the act of cutting Eric J. with a knife; (2) that a trier of fact could reasonably conclude from the evidence admitted that this act, whether based on the weapon used or the nature of the injury inflicted, or both, constituted an aggravated battery, if that act were unjustified, in that all of the elements of the offense itself were proved beyond a reasonable doubt; and (3) that, based solely on the evidence admitted, a trier of fact could reasonably conclude that W.D.'s act was not legally justified under the circumstances. However, considering the testimony of all the witnesses and the possible inferences therefrom, the case was a close one in our view. The State's burden to negate the affirmative defense beyond a reasonable doubt is a high burden, and evidence as to the state of a defendant's mind, at the moment he acted, as probative of a reasonable belief that a certain degree of force was necessary to avert a particular degree of harm is always material, and often crucial, evidence where defense of person is the issue. (See *People v. Williams* (1977), 45 Ill. App. 3d 338, 343, 359 N.E.2d 736, 739.) Furthermore, the accused in a criminal prosecution should be given wide latitude in cross-examining State's witnesses. (*People v. Smylie* (1981), 103 Ill. App. 3d 679, 684, 431 N.E.2d 1130, 1134.) It is also well established that a defendant claiming self-defense may show specific acts of violence and threats by the victim which are known to him, and that he should be given substantial latitude in this area of proof, which is admissible to show the circumstances confronting him, the extent of this apparent danger, and the motive by which he was influenced. (See *People v. Stombaugh* (1972), 52 Ill. 2d 130, 139, 284 N.E.2d 640, 645; *People v. Robinson* (1987), 163 Ill. App. 3d 754, 773, 516 N.E.2d 1292, 1306; *People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 60, 452 N.E.2d 32, 35; *People v. Graves* (1978), 61 Ill. App. 3d 732, 740, 378 N.E.2d 293, 299.) Such knowledge necessarily affects

the defendant's perceptions of and reactions to the victim's behavior and are thus relevant to the reasonableness of the defendant's self-defense force. *People v. Robinson*, 163 Ill. App. 3d at 773, 516 N.E.2d at 1306.

These principles are logically applicable to a situation where the victim and a third person are jointly acting as aggressors against the defendant's relative, and the defendant claims that his use of force against the victim was in defense of that relative. As stated above, the law in Illinois is that the defendant stands in the shoes of the other against whom unlawful force is threatened and may take steps which the other could lawfully take in his own defense. There is also authority for permitting evidence of previous threats and the quarrelsome or violent disposition of a third party where that party and the victim are attacking the defendant, who claims to have acted in self-defense. (*People v. Robinson* (1987), 163 Ill. App. 3d 754, 773-74, 516 N.E.2d 1292, 1307; *People v. Wood* (1984), 129 Ill. App. 3d 29, 33, 471 N.E.2d 1060, 1062; *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 16, 414 N.E.2d 262, 264-65.) In the case at bar, Officer Rowski was precluded from testifying fully as to whether W.D., in relating the facts and circumstances of the fight, stated that John V. was armed with a bottle or threatened Robert D. with a bottle during the fight, or whether he had previously threatened him with a bottle. The witness was also precluded from testifying as to whether W.D. had stated that John V. had a gun. In light of the complete record, including Eric J.'s testimony indicating that John may have had a bottle in his hand during the fight, the testimony of two defense witnesses that John had, as little as five minutes before the fight, threatened Robert by holding a bottle over his head, and substantial testimony tending to show John's role in instigating the fight and his quarrelsome nature, including Robert's statement that John had returned later that same evening to ask him if "he wanted to play pistol play," we believe that W.D.'s defense was prejudiced by the limitations placed upon his cross-examination of Officer Rowski relating to his admission. The testimony sought by defense counsel could hardly have been less remote or more relevant to the question of whether minor respondent was justifiably acting in defense of his cousin at the instant he decided to use the knife. Moreover, any testimony which may have been elicited which was favorable to W.D.'s defense would not have been merely cumulative of the testimony of others which indicated the level of danger faced by Robert D. Officer Rowski's testimony alone was "state of mind" testimony which tended to show whether and how W.D.'s personal knowledge of his cousin's attackers, and his own re-

ported observations, affected his perceptions of and reactions to their behavior. (See *People v. Lynch* (1984), 104 Ill. 2d 194, 199-200, 470 N.E.2d 1018, 1020.) As the justification question was a close one on the facts, the precluded testimony reasonably could have affected the outcome. Minor respondent was entitled to have the trier of fact judge the reasonableness of his behavior in light of all relevant and admissible facts and circumstances. For these reasons, the limitations placed on the investigating officer's testimony constituted reversible error.

Because we believe that minor respondent was denied an opportunity for an effective cross-examination of an important State's witness, and because the error, under the particular facts of this case, was manifestly prejudicial to his defense, we find that he is entitled to a new trial on the three allegations in the delinquency petition, all of which arose out of the same act. In remanding this case, we observe that the trial court, in adjudicating minor respondent "delinquent as charged," did not specify the count or counts upon which the finding of delinquency was based. While in a juvenile case this practice may not be prejudicial (see *In re Stiff* (1975), 32 Ill. App. 3d 971, 978-79, 336 N.E.2d 619, 625), we believe that the better practice, particularly in aid of the reviewing court, is for the trial judge to specify the charge or charges, of those alleged in the petition, upon which the finding of delinquency and the disposition are based. .

The question of whether minor respondent's act, which he committed beyond any dispute, was justified under all of the facts and circumstances is a question to be resolved by the trier of fact. While we are aware that this is a close case and that support could be found for either affirmance or reversal, we believe that, based on the record before us, reversal is required. Considering the circumstances of the altercation, the force threatened against a close relative, and the force used against the victim, we believe justice and fairness required a trial which permitted minor respondent to exercise the substantial latitude in cross-examination to which he was legally entitled. Accordingly, the finding of delinquency is reversed, and the adjudication of wardship and recommitment to the Department of Corrections based upon that finding are vacated.

This case is remanded to the circuit court for proceedings not inconsistent with this opinion.

Reversed and remanded with directions.

LORENZ and MURRAY, JJ., concur.